

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **IN RE: LIBERTY NATIONAL** | ) | Master Case Number: |
| **INSURANCE CASES** | ) | **1:02-cv-2741-UWC** |

_____

| | | |
|---|---|---|
| **ELLEN GAYLE MOORE and** | ) | |
| **FANNIE W. MCCONNELL, on** | ) | |
| **behalf of themselves and all** | ) | |
| **others similarly situated,** | ) | |
| | ) | Civil Action Number |
| Plaintiffs, | ) | **2:99-cv-3262-UWC** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **LIBERTY NATIONAL** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION
## APPROVING PROPOSED CLASS ACTION SETTLEMENT

This action was commenced on December 8, 1999, by an alleged class of
African-American policyholders of Liberty National Life Insurance Company
("Liberty National").  The suit alleges, *inter alia*, violations of 42 U.S.C. §§ 1981
and 1982 through racially discriminatory pricing, design, and sale of industrial life,
burial, and low face value insurance sold in past decades.  The claims are asserted
individually and on behalf of all African-American policyholders who purchased
or have or had any legal or beneficial interests in the challenged policies.  The case
is before the Court on the parties' joint request for final approval of a proposed

class action settlement and consent decree designed to achieve global settlement of these claims. Having considered the submissions of the parties and the totality of the evidence in the record, the Court hereby makes the following findings of fact and conclusions of law, and grants final approval to the Settlement in its entirety.

## I.    FACTUAL BACKGROUND.

### A.    The Claims.

In December of 1999, Ellen Gayle Moore and Fannie McConnell, along with others, filed a class action Complaint against Liberty National. (*Moore* Doc. 1). The Complaint was subsequently amended on more than one occasion. (*Moore* Docs. 55, 108). The Complaints sought, among other things, redress under 42 U.S.C. §§ 1981 and 1982 based on allegations of racial discrimination relating to the pricing, design, marketing, sale, formation and administration of certain life insurance policies issued to African-Americans by Liberty National and its former subsidiary Service Insurance Company of Alabama ("Service").

The Complaint as amended alleged that Liberty National intentionally discriminated against African-Americans by charging African-Americans higher premiums for the same or similar insurance benefits, or charging them similar premiums for policies with lower benefits or values, compared to similarly situated Caucasians. In its Answer, as amended, Liberty National denied the material

allegations of the Complaint, and asserted numerous affirmative defenses, including the statute of limitations; reverse preemption of 42 U.S.C §§ 1981 and 1982 by virtue of the McCarran-Ferguson Act, 15 U.S.C. § 1011; the Filed Rate Doctrine; and a host of others.

**B.**     **Procedural History.**

Plaintiffs Ellen Gayle Moore and Fannie McConnell originally filed this multi-count, putative nationwide class action lawsuit against Liberty National for sales practices the Plaintiffs alleged were fraudulent and discriminatory in nature. The initial Complaint was filed on December 8, 1999, and alleged that Liberty National's insurance sales practices violated federal civil rights laws as well as Alabama common law.  (*Moore* Doc. 1).  The lawsuit demanded compensatory and punitive damages in an unspecified amount.  (*Id.*)  The demand for compensatory damages was later removed in Plaintiffs' Second Amended Complaint (at ¶ 87). There are also over 2,000 individual plaintiffs (many of whom claim to also be Class Members) who have filed almost identical individual Complaints against Liberty National seeking compensatory damages, punitive damages, or both under §§ 1981 and 1982.  The Court has consolidated the individual actions with the class action in one master file styled *In re Liberty National Insurance Cases*, 2:02-cv-02741-UWC.  As a result, while the Class Representatives and Class Counsel have sought to recover what they have characterized as "equitable" relief on behalf

of the Class, over 2,000 individuals represented by separate counsel are seeking to recover additional compensatory and punitive damages on the exact same factual allegations in the same consolidated action.[1]

Throughout the litigation, Liberty National has contended that the challenged insurance practices were lawful at the time, were approved and, in some cases, mandated by state insurance regulators, were abandoned long ago, and were an effort to price policies according to mortality risks.  Over the course of these proceedings, Liberty National frequently explained its alleged actuarial basis for differential pricing in the industrial insurance industry, noting that the business of insurance typically involves pricing based upon the risks that different groups of individuals pose to the pool of insureds.  This generally means charging different

---

[1]  See Complaints and Amended Complaints filed in 2:02-cv-00219-UWC (*Hull. v. Liberty Nat'l Life Ins. Co.*);  2:02-cv-00454-UWC (*Adams v. Liberty Nat'l Life Ins. Co*);  2:02-cv-00576-UWC (*Wilkins v. Liberty Nat'l Life Ins. Co.*);  2:02-cv-00639-UWC (*Sunday, et al. v. Liberty Nat'l Life Ins. Co.*);  2:02-cv-00717-UWC (*Williams, et al. v. Liberty Nat'l Life Ins. Co.*);  2:02-cv-00718-UWC (*Brown v. Liberty Nat'l Life Ins. Co.*);  2:02-cv-00719-UWC (*Hudson, et al. v. Liberty Nat'l Life Ins. Co.*);  2:02-cv-00903-UWC (*Gray v. Liberty Nat'l Life Ins. Co.*);  2:02-cv-00946-UWC (*Betton v. Liberty Nat'l Life Ins. Co.*);  2:02-cv-01011-UWC (*Robinson, et al. v. Liberty Nat'l Life Ins. Co.*);  2:02-cv-01034-UWC (*Portias v. Liberty Nat'l Life Ins. Co.*);  2:02-cv-01371-UWC (*Durrough, et al. v. Liberty Nat'l Life Ins. Co.*);  2:02-cv-01498-UWC (*Morgan v. Liberty Nat'l Life Ins. Co.*);  2:02-cv-01619-UWC (*Arnold v. Liberty Nat'l Life Ins. Co.*);  2:02-cv-01875-UWC (*Townsell, et al. v. Liberty Nat'l Life Ins. Co.*);  2:03-cv-02335-UWC (*Bass, et al. v. Liberty Nat'l Life Ins. Co.*);  2:04-cv-00290-UWC (*Billingsley, et al. v. Liberty Nat'l Life Ins. Co.*);  2:04-cv-00620-UWC (*Edwards v. Liberty Nat'l Life Ins. Co.*);  2:05-cv-01567-UWC (*Hatchett,  et al. v. Liberty Nat'l Life Ins. Co.*);  2:05-cv-01568-UWC (*Warren, et al. v. Liberty Nat'l Life Ins. Co.*);  2:05-cv-01571-UWC (*Barnes, et al. v. Liberty Nat'l Life Ins. Co.*);  2:05-cv-01572-UWC (*Clark, et al. v. Liberty Nat'l Life Ins. Co.*);  2:05-cv-01573-UWC (*Rogers, et al. v. Liberty Nat'l Life Ins. Co.*);  2:05-cv-01642-UWC (*Marshall, et al. v. Liberty Nat'l Life Ins. Co.*);  2:05-cv-01765-UWC (*Byrdsong, et al. v. Liberty Nat'l Life Ins. Co.*);  2:05-cv-01774-UWC (*Holmes, et al. v. Liberty Nat'l Life Ins. Co.*);  2:05-cv-01775-UWC (*Taylor, et al. v. Liberty Nat'l Life Ins. Co.*);  2:05-cv-01776-UWC (*Finner, et al. v. Liberty Nat'l Life Ins. Co.*).

rates for different risks.  Thus, men are often charged higher life insurance rates than women and smokers are charged higher health insurance rates than nonsmokers.[2]

Liberty National has also contended that from the early decades of the 20th Century until the Civil Rights Movement, the industrial insurance industry computed premiums separately by race based upon actuarial differences in life expectancy and mortality by race, which were well documented in U.S. Census Bureau statistics.  *See*, *e.g.*, *Statistical Abstract of the United States 1998, The National Data Book* (1998) (Table Nos. 127–32); *Statistical Abstract of the United States 1949* (1949) (Table Nos. 88–89); *U.S. Dept. of Commerce, Historical Statistics of the United States: Colonial Times to 1970, Part 1 at 55–56* (1975) (Series B 107–115 & Series B 116–125). Starting in 1930, when most insurance companies refused outright to sell insurance to African-Americans, Liberty National instead began selling insurance to African-American citizens, albeit at higher rates than Caucasians purportedly based upon the shorter life expectancy and higher mortality risks of American-Americans generally.  (M. Doc. 26 at ¶¶ 8-15, 80 and Exs. 10-31 (2003 McWhorter Affidavit)).  Liberty National has also placed in the record historical evidence which it contends shows that insurance

---

[2] *See* George J. Benston, *The Economics of Gender Discrimination in Employee Fringe Benefits: Manhart Revisited*, 49 U. CHI. L. REV. 489, 499–501 (1982), *cited in Arizona Governing Comm. v. Norris*, 463 U.S. 1073, 1103–05 (1983) (Powell, J., concurring in part and dissenting in part).

regulators in Alabama and other states approved and often mandated premiums based on race-distinct mortality to ensure the solvency of the insurance plans. (*Id.*)[3]  The record reflects that Liberty National stopped selling policies on this basis by 1949, at which time Liberty National created a separate subsidiary Service to market Service's separate portfolio of policies at its own separate unitary rates, with Service selling predominantly to African-American households until January of 1966. (*Id.* ¶¶ 17-23, 30-31 & Exs. 33-48).  The record further reflects that from mid-January 1966 forward, both companies ceased all pricing based upon race-distinct mortality.  (*Id.*)  Moreover, both Liberty National and Service stopped collecting premiums on their pre-1966 policies sold to African-Americans as of the late 1980s.  (*Id.* ¶¶ 39, 41 & Exs. 65, 66).  Class Plaintiffs have disputed both the applicability and viability of Liberty National's defenses.

This action has been fiercely contested since its inception.  Class Plaintiffs originally filed this case as a damages class action under Rule 23(b)(3), seeking to recover economic losses, mental anguish, and punitive damages under §§ 1981 and 1982.  (Doc. No. 1 ¶¶ 7, 50, 66 & prayer ¶ b).  Shortly thereafter, the Court granted Liberty National's Motion for Judgment on the Pleadings as to the state law claims on grounds of repose, but denied judgment on the pleadings as to the timeliness and McCarran-Ferguson Act defenses raised by Liberty National.  (*See* Orders

---

[3]  *See also Moore* Docs. 229-242 at Exs. 11-12, 21-23, 26-28, 30-32, 34-35, 37-42, 44-46, 51-56, 58-80; M. Doc. 175 (2006 McWhorter Affidavit); *Moore* Doc. 223 at  Exs. 15, 17-18, 20-55; M. Doc. 173 (2006 Campbell Declaration).

dated 4/7/00, 7/3/00, and 7/21/00 in CV-99-UWC-3262-S).    Liberty National

sought and obtained interlocutory appellate review on those issues.    However,

following oral argument, the Eleventh Circuit affirmed this Court's denial of the

Motion for Judgment on the Pleadings as to these defenses.  *See Moore v. Liberty

Nat'l Life Ins. Co.*, 267 F.3d 1209 (11th Cir. 2001).

When Liberty National moved to strike the Rule 23(b)(3) Class allegations

due to individualized issues of liability and damages in accordance with *Rutstein v.

Avis Rent-a-Car Systems, Inc.*, 211 F.3d 1228 (11th Cir. 2000), Class Counsel

indicated their intent "to seek certification of a class under Rule 23(b)(2), not

(b)(3)," (M. Doc. 79 at 12), and that they would amend the Complaint "to amplify

... the allegations seeking equitable relief ... and to eliminate any references to

compensatory damages."  (*Id.* at 3 n.5).

Plaintiffs thereafter filed an Amended Class Action Complaint dropping any

explicit request for compensatory damages on behalf of the class.    Instead, the

prayer for relief recharacterized Plaintiffs' request for monetary relief, and now

sought "equitable relief as permitted by law or equity," including "restitution" or

"disgorge[ment]" of excess premiums and a "constructive trust" against "Liberty

National's ill-gotten funds."  (Doc. No. 108 prayer ¶¶ D–E).

Extensive discovery on class action issues ensued, followed by vigorously contested class certification briefing, including voluminous evidentiary submissions by Liberty National in opposition to class certification (M. Docs. 18-29).  Following a class certification hearing on September 16, 2003, the Court entered an Order on May 18, 2004 certifying the case as a non-opt-out class action under Rule 23(b)(2).  (M. Doc. 56).  The Court found the monetary relief sought by the Class — namely, premium refunds, plus interest — to be incidental to the injunctive and declaratory relief sought.  (*Id.*)  The Court noted that "[a]n important factor in the Named Plaintiffs' determination not to seek compensatory damages is that if such damages were sought in this case, Liberty National would surely argue that such damages predominate and, thus, are not incidental to the relief sought under [Rule 23(b)(2)]."  (*Id.*)  Although the Court recognized that the relief sought by the Class Plaintiffs still had "a monetary component," it concluded that premium refunds could be "calculated by means of objective standards and [are] not dependent in any significant way on the intangible, subjective differences of each class member's circumstances."  (*Id.*)  (citing *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 415 (5th Cir. 1998)) (internal quotation omitted).

Liberty National moved for reconsideration, but the Court declined to alter its Rule 23(b)(2) certification of the Class.  (M. Doc. 61-63).  The Court defined the Class as:

> All black Americans who have (or had at the time of the policy's termination), an ownership interest in an industrial life insurance policy or burial policy issued by Liberty National [Life] Insurance Company or its subsidiary Service Insurance Company of Alabama, prior to January 1, 1966, at a higher rate than similar plans offered to similarly situated white Americans by Defendant Liberty National ..., or its subsidiary Service.

(M. Doc. 63, entered May 18, 2004).  As part of its certification of a 23(b)(2) class, the Court "eliminate[d] Rule 23(b)(2) certification of Plaintiffs' demand for punitive damages."  (*Id.*)  The Court found that "punitive damages are not appropriate" and "will not be awarded to the class" because "declaratory and injunctive issues predominate in this case."  (*Id.*)  The Court stated that "[i]f the class prevails, the incidental restitution is more consistent with the primary relief being sought."  (*Id.*)  Liberty National then petitioned the Eleventh Circuit for permission to appeal under Rule 23(f).  Class Counsel opposed the petition.  Counsel for individual Plaintiffs in two consolidated cases supported Liberty National's petition.  Nevertheless, a motions panel of the Eleventh Circuit denied permission to appeal.  *See In re Liberty Nat'l Ins. Co.*, No. 05-90009-A, slip op. (11th Cir. May 19, 2005).

After the Eleventh Circuit denied Liberty National's Rule 23(f) petition, the Court held a status conference at which it indicated that the over 2,000 individual Plaintiffs' legal claims for compensatory and punitive damages would be adjudicated after all liability issues as to both Class wide and individual claims

were tried to the bench.  As intensive discovery on merits issues commenced, Liberty National filed a motion challenging what it viewed as the Court's substantive changes to the certified Class.  (M. Doc. No. 97).  Among other things, Liberty National argued that holding a bench trial on liability and equitable relief before conducting a jury trial on money damages would violate the Seventh Amendment.  (*Id.* at 9).

The Court held a hearing on Liberty National's motion. (M. Doc. 136).  The Court stated that it "does not anticipate a jury trial on the 23(b)(2) action following the determination of liability if it is adverse to the defendant."  (*Id.*) Rather, the Court explained, "equitable relief — which is never tried by a jury —will be awarded."  (*Id.*)  Such equitable relief "will be determined by the premiums actually paid by the class members to the company."  (*Id.*)  When Liberty National asked "about the compensatory and punitive damages sought in the individual cases that have been consolidated," the Court stated, "[f]ollowing a determination on the liability question, if the Court determines that there is no liability, that's the end of the individual plaintiffs' case."  (*Id.*)  If, however, the Court found Liberty National liable, the Court indicated that "the individual plaintiffs, having filed a separate lawsuit[,] are then entitled to pursue compensatory damages, at least," and that the Court would determine later if the Plaintiffs in the consolidated individual cases were entitled to pursue punitive damages.  (*Id.*)

Thereafter, the Court entered an Order denying Liberty National's motion. (M. Doc. 132). The Court stated, "[t]his action has been certified as a Rule 23(b)(2) class action. The class members include those who have filed separate actions against the defendant; and all class members will be bound by the liability determination in this case, whether it is favorable or unfavorable to them." (*Id.*) The Court also ruled definitively that "[t]he class members who have filed separate actions against the Defendant retain their right to seek compensatory and punitive damages in addition to equitable relief, in the event that the class prevails on the liability issue." (*Id.*) The Court then entered a Scheduling Order setting the "trial of these cases" on December 5, 2005, and bifurcating the liability issue from the issue of relief. (M. Doc. 163).

Liberty National again petitioned the Eleventh Circuit for a writ of mandamus, arguing that the trial plan adopted by this Court violated the Seventh Amendment rights of both Liberty National and absent Class Members by scheduling a Class-wide bench trial instead of a jury trial on liability and by failing to give absent Class Members notice and the right to opt out of the proceedings. Liberty National also petitioned for mandamus relief or Rule 23(f) review of the Court's decision adding the individual Plaintiffs' claims for compensatory and punitive damages to this Class certified under Rule 23(b)(2). A motions panel of

the Eleventh Circuit denied the petition in an unpublished order. *See In re Liberty Nat'l Ins. Co.,* No. 05-14500-B, slip op. (11th Cir. Sept. 8, 2005).

Thereafter, on the eve of trial and as summary judgment motions on the merits were about to be filed, the parties reached a framework upon which they believed a settlement could be negotiated. Based on the representations of counsel to that effect, this Court continued the trial for one month. The parties ultimately filed a Stipulation of Settlement on January 19, 2006, and an Amended Stipulation of Settlement on January 26, 2006. (M. Docs. 168 and 171). This Court preliminarily approved the Amended Stipulation, pending Notice to the Class and a Fairness Hearing, and also approved the procedures for Class Notice. (Order, entered Jan. 27, 2006).

During the discovery phase of the lawsuit, Liberty National responded to numerous interrogatories, requests for admission, and document requests from Plaintiffs, and Plaintiffs responded to similarly voluminous written discovery requests from Liberty National. Under the Amended Stipulation, those requests and responses were made available for review by any Class Member who desired to review them, along with all other discovery in the action, and the procedure for doing so was included in the Class Notice Package. (*Moore* Doc. 226 at Ex. A; M. Doc. 174 (Shirley Taylor Affidavit)).

Liberty National produced tens of thousands of pages of documents in the discovery phases of this litigation, spanning its entire history in the industrial insurance business, including hundreds of policy forms and ratebooks relating to the policies at issue in the lawsuit; thousands of pages of documents related to acquisition of companies or books of business which contained similar policies; all documents related to Named Plaintiffs' policies; thousands of pages of annual statements of Liberty National and its former subsidiary Service Insurance Company of Alabama ("Service"); and thousands of pages of other requested documentation related to rate setting, governmental rate regulation, marketing policies and procedures, historical actuarial documents, and the like.  In all, Liberty National produced 115,327 pages of documents in hard copy form, and made hundreds of thousands of additional documents available for review, in addition to producing all relevant policy forms and ratebooks for class policies on CD-ROM. (*Moore* Doc. 223 at Ex. 58; M. Doc. 173).

In addition to written discovery and document productions, Liberty National offered numerous deposition witnesses on topics identified by Plaintiffs.  For example, Jim Hill, Vice President and Data Processing Administrator, testified regarding computer systems and electronic record keeping.  (*Moore* Doc. 220; M. Doc 173).  Chief Actuary John Chou and former Industrial Actuary Don Yates were deposed on various actuarial issues.   Liberty National CEO Anthony

McWhorter was deposed on three separate occasions on a variety of topics related to this litigation.  Liberty National's independent actuarial expert Randall Mire was deposed twice, as was its independent historical expert, Professor Henry McKiven. (*See, e.g., Moore* Docs. 219, 222; M. Doc 173).  An additional actuarial expert for Liberty National, James Harrison, was also deposed.  (*Moore* Doc. 221; M. Doc 173).  The Named Plaintiffs were likewise deposed, along with their independent actuarial and historical experts, Dr. Vincent Patrick Gallagher and Dr. Robert J. Norrell.  The experts for each side also submitted extensive written reports.  (*See, e.g.,* M. Docs 27-28, 145-147, 149).

**C.**      **The Settlement.**

The Proposed Settlement encompasses policies sold by Liberty National to African-Americans on a race-distinct pricing structure from 1930 through 1949, pursuant to which African-Americans were charged more than whites (or sold policies with lower overall benefits than whites) on an explicitly race-distinct basis. (M. Doc. 168 at 11-12).  The Settlement also encompasses policies marketed by Service, Liberty National's former subsidiary, from January 1, 1949 through January 10, 1966, during which time Service sold polices predominantly to African-Americans (*id.*), and did so at generally higher rates (or with lower benefits) than the nearest comparable policies contemporaneously sold by Liberty National, which at that time marketed predominantly to white families.

An independent report commissioned by the Alabama Department of Insurance while this action was pending, performed by John McBain as Consulting Actuary to the Alabama Department of Insurance, concluded that the average premium differential for race-distinct merchandise burial policies in the Class at issue was in force was approximately 25 percent, and that the average premium differential between the higher and lower rates for the cash policies included in the Class was approximately 35 percent. (*See Moore* Doc. 223 at Ex. 57; M. Doc. 173).

Under the terms of the Settlement, eligible Class Members with in-force, extended term, or reduced paid up race-distinct industrial cash policies will receive, in addition to the stated benefits of their policies, and payable contemporaneously with payment of policy benefits, an additional settlement benefit equal to 35 percent of the stated policy benefit, subject to certain maximums. (M. Doc. 168 at 15-24). Eligible persons with in-force, extended term, or reduced paid up higher-priced merchandise burial policies will, in addition to the benefits of those policies, and payable contemporaneously with said policy benefits, an additional Settlement benefit of up to 25 percent of the original reserve amount upon which the policies were originally priced. (*Id.*) These figures match precisely what the consulting actuary for the Alabama Department of Insurance found to be the average premium differential for the policies at issue (*see Moore*

Doc. 223 at Ex. 57; M. Doc 173), and far exceed any "blended rate" that would have prevailed had blended mortality been used to price the products at issue (*see* M. Doc. 149 at ¶¶ 212-215 (2005 Mire Report); *Moore* Doc. 228 at 78: 6-18; M. Doc. 175 (2005 Deposition of Gallagher)).   Liberty National has consistently contended that even if liability were established in this case, the monetary recovery would be limited to the difference between the "blended" rate that would have prevailed in the absence of discrimination and the rate actually charged.  *See City of Los Angeles, Dept. of Water & Power v. Manhart,* 435 U.S. 702, 721 n.6 (1978).

The Settlement does not ignore terminated policies either.  The Stipulation provides that eligible persons whose Class policies terminated without benefit are eligible to reinstate their policies and obtain the same additional Settlement benefit enhancement they would be entitled to if their policies had remained in force, and that eligible policies on which death claims or other benefits were previously paid have the opportunity to receive retroactive Settlement benefit enhancements in the same percentages as in-force policies.  (M. Doc. 168 at 15-22).

In short, the Settlement eliminates the risk of litigation for the Class while providing immediate and fair redress for the premium differentials at issue in this action; provides fair and appropriate procedures for Class Members to obtain benefits to which they are entitled under the Settlement; and includes detailed

procedures for the administration of the Settlement by Liberty National under the supervision of Class Counsel and the Court.  (M. Doc. 168 at 24-39).  In exchange for the foregoing, the Settlement includes a broad class-wide release and dismissal of the claims at issue. (*Id.* at 41-47).

Class Members were notified of the Settlement by a Court-approved Notice mailed to all Class Members for whom Liberty National has a valid current address in its master file records.   The notice contained all the material terms of the Settlement and provided appropriate forms to establish eligibility for relief. (*Moore* Doc. 226 at Ex. A; 174).  The mailed Notice was supplemented by posting the Class Notice Package on Liberty National's website and posting Summary Notice Cards in all Liberty National field offices.  (*Id*. at Exs. C-D).  Additionally, Liberty National published both advertisements and Summary Notices regarding the Settlement in numerous newspapers, and broadcast Notice of the Settlement was aired on numerous radio stations approved by the Court.  (*Id*. at Ex. B).  The Court has heretofore found, and hereby confirms, that this Notice procedure as in fact implemented was the best notice practicable under the circumstances.  (M. Doc. 169 at 4; *see also* Order, entered Jan. 27, 2006).  The Notice also complied with all standards listed in the *Manual for Complex Litigation Third* § 30.212, at 228.

Through these extensive Court-approved procedures, Class Members were notified of their opportunity to object to the Settlement, attend the Fairness Hearing held by this Court on March 31, 2006, and obtain additional information by calling toll-free numbers established pursuant to the Settlement.  They were also notified how to submit claims for relief where required under the Settlement.  A large number of Claim Forms and Requests for Reinstatement Information have been received to date in response to the Court-approved Notice procedure.  (*See* Moore Doc. 226 at ¶ 7; M. Doc. 174 (2006 Affidavit of Shirley Taylor)).  Class Members can continue to submit claim forms through and including July 31, 2006, so more claim forms likely will be forthcoming.  (*Id.* at ¶ 7; *see also* M. Doc. 168 at 6).  Under the Stipulation, the mandatory claim-in requirement is reasonably limited to persons whose policies are terminated or out-of-force, and therefore cannot as a practical matter be accurately located or identified at this late date by other means on a practical and efficient basis. (M. Doc. 168 at 6).  The Stipulation further provides that any disputes as to eligibility or entitlement to relief will be submitted to the Court for resolution in a manner that the Court directs.  (*Id.*).

All relief under the Settlement is subject to a maximum aggregate total of $6 million in cash payments or additional reserves to be expended by Liberty National.  (M. Doc 168 at 22-24).  The $6 million maximum provided for by the Settlement, combined with the attorneys' fees, expenses, and the Settlement

administration costs borne exclusively by Liberty National under the terms of the Settlement, all combine to provide a generous level of relief to Class Members while at the same time avoiding continued protracted litigation and preserving Liberty National's ability to continue servicing all of its policyholders.   Certain categories of claim-in relief under the Settlement are also subject to <u>minimum</u> payout guarantees, under which any unclaimed balance will be contributed to various institutions for African-American scholarships.   (*Id.*).   In short, the Settlement gives Class Members the opportunity to effectively eliminate any race-based differentials in their insurance contracts, and provides the potential for substantial additional charitable contributions to African-American education.

Class Counsel have been involved in numerous prior class settlements involving claims similar to those at issue here, including at least one similar class action in this Court.   In *Carnegie v. Mutual Savings Life Insurance Co.*, No. CV-99-S3292-NE, this Court (Lynwood Smith, J.) approved a class settlement of virtually identical claims on terms very similar to the terms of the Settlement now under consideration.   These factors have been given due consideration by the Court in its consideration of the settlement calculus.

Finally, although Defendants agreed not to object to Class Counsel's request for a reasonable fee, which was agreed to be at or below a certain amount, the specific amount to be awarded within that range was left to the

Court, and even this limited agreement as to fees was not negotiated prior to agreement on the class relief.

**D.**      **The Preliminary Approval.**

The fact of settlement does not diminish this Court's responsibilities, except in one respect. "Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997). The remaining Rule 23 class certification criteria "demand undiluted, even heightened, attention in the settlement context." *Id.*

Thus, even though settlement "is relevant to a class certification," and it "is a factor" to be considered "in the calculus," the mere fact of agreement:

> does not inevitably signal that class action certification should be granted more readily than it would be were the case to be litigated …. settlement classes sometimes warrant more, not less caution on the question of certification.

*Id.* at 620-22 and n.16.   Here, however, substantially the same class was certified on a contested basis before settlement was reached.

Accordingly, this Court focused its settlement inquiry by preliminarily analyzing the Proposed Settlement to determine whether there was,

> in effect, "probable cause" to submit the proposal to members of the class and to hold a full-scale hearing on its fairness, at which all interested parties [would] have an opportunity to be heard and after which a formal finding on the fairness of the proposal [would] be made.

*In re Mid-Atlantic Toyota Antitrust Litig.,* 564 F. Supp. 1379, 1384 (D. Md. 1983).

The Court is fully aware of the facts and circumstances leading to the Proposed Settlement.   On the basis of a thorough review of the Amended Stipulation and Agreement of Compromise and Settlement, and its review of all briefs, motions, and pleadings, supplemented by the totality of the record and the Court's prior orders and opinions certifying a class over the defendant's objection, the Court determined the Proposed Settlement was within the range of possible approval, and preliminarily approved the settlement pending a Notice and a Fairness Hearing.

### E.    The Fairness Hearing.

Despite the extensive Notice efforts, no member of the proposed class objected to the Proposed Settlement or otherwise identified any defect in the Settlement, either procedurally or substantively.

As Class Members were informed in the Class Notice efforts, a Fairness Hearing was convened as scheduled on March 31, 2006, at which time the Court heard oral argument from Class Counsel and counsel for the defendant. All Class Members were provided an opportunity to be heard and to submit evidence in support of or in opposition to on the Proposed Settlement. None took advantage of that opportunity. Class Counsel and counsel for defendant each made extensive written submissions of argument and evidence in support of the Proposed Settlement in advance of the Fairness Hearing.

## II.    THE COURT'S ASSESSMENT OF THE PROPOSED SETTLEMENT.

### A.    Class Certification.

Rule 23 of the Federal Rules of Civil Procedure governs the certification of class actions.  District courts are required to conduct a "rigorous analysis"

of that rule's requirements,[4] even when presented with a request for class certification as part of settlement.  *Amchem,* 521 U.S. at 620-21.

Rule 23(a) states four threshold requirements applicable to all class actions: (1) *numerosity* ("the class is so numerous that joinder of all members is impracticable"); (2) *commonality* ("there are questions of law or fact common to the class"); (3) *typicality* (the named parties' claims or defenses "are typical ... of the class"); and (4) *adequacy of representation* ("the representative parties will fairly and adequately protect the interests of the class").

In addition to satisfying all prerequisites of Rule 23(a), parties seeking class certification must show that the action is maintainable under at least one of the three categories of Rule 23(b).  Here, Plaintiffs ultimately sought certification under Rules 23(b)(2).

Rule 23(b)(2) permits class actions for declaratory or injunctive relief where "the party opposing the class has acted or refused to act on grounds generally applicable to the class."  It is particularly suited for civil rights actions.  *Amchem*, 521 U.S. at 614 ("Civil rights cases against parties charged

---

[4]  *General Tele. Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982).

with unlawful, class-based discrimination are prime examples" of 23(b)(2) class actions).

In this case, this Court has previously conducted a rigorous analysis of the requirements for class certification on a contested basis. Nothing that has occurred since convinces the Court that the findings and conclusions expressed in that opinion regarding numerosity, commonality, adequacy of representation, typicality, or the other prerequisites to certification under Fed. R. Civ. P. 23(b)(2) were erroneous in any way. Indeed, the recent decision of the United States Court of Appeals in *In re Monumental Life Insurance Company*, 365 F.3d 408 (5th Cir. 2004), reinforces this Court's conviction that its reasoning and its findings and conclusions expressed in that opinion were correct. Nor does the fact that the parties have stipulated to a slightly restated class definition for purposes of settlement change any aspect of the Court's prior analysis of the propriety of class certification, because the restated definition does not affect the basis of the Court's prior rulings on class certification. For purposes of final approval of this Settlement the Court therefore incorporates by reference herein its prior findings and conclusions expressed in the record of this action as to the propriety of class certification of these claims, and finds that they are equally applicable to the stipulated class certification for settlement purposes herein proposed.

Based upon the foregoing, the stipulations of the parties, and the totality of the record before the Court, the Court therefore finds that certification of the proposed Class for settlement purposes is appropriate, and final certification is therefore granted to a class defined as:

**All black Americans who have (or had at the time of the policy's termination) an ownership or other legal interest in an industrial life insurance policy or burial policy issued by Liberty National Life Insurance Company, or one of its former subsidiaries, Service Insurance Company of Alabama, or Burial Service Insurance Company of Alabama on or before January 10, 1966, at a higher rate than similar plans offered to similarly situated white Americans.**

For purposes of this class definition, the terms "industrial insurance policy" and "burial policy" are not limited to the statutory definition of industrial life insurance or burial insurance. Rather, an industrial insurance policy is one that pays a pre-determined monetary amount (not to exceed $2,000) directly to the beneficiary, including any life insurance policy stamped, marked, or otherwise referred to or categorized (either expressly or commonly) as "industrial," "debit," or "home service" insurance. A burial or funeral policy under the foregoing class definition is one which provides "goods" (including, but not limited to, a casket, burial outfit or other funeral services) to the beneficiary on the death of the insured.

The class definition covers all industrial and burial policies insuring African-Americans which were issued by Liberty National Life Insurance Company on or before December 31, 1949, and all industrial and burial policies insuring African-Americans which were issued by Service Insurance Company of Alabama or Burial Service Insurance Company of Alabama on or before January 10, 1966, except as otherwise expressly set forth herein.

Excluded from this class are all federal judges, their spouses, and persons within the third degree of relationship to them.

### B.    Standards for Evaluation of Fairness of the Proposed Settlement.

The policy of federal courts, favoring voluntary resolution of litigation through settlement, is particularly strong in the context of class actions. *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977).[5] Notwithstanding such proclivity, Federal Rule of Civil Procedure 23(e) mandates:  "A class action shall not be dismissed or compromised without the approval of the court."

The district court's primary responsibility when evaluating a proposed class action settlement pursuant to Rule 23(c) is to decide whether it is "fair, reasonable, and adequate under the circumstances and whether the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued."  *Manual for Complex Litigation Third* § 30.42, at 238 (1995); *see also, e.g., Leverso v. SouthTrust Bank*, 18 F.3d 1527, 1530 (11th Cir. 1994); *In re Smith*, 926 F.2d 1027, 1028-29 (11th Cir. 1991); *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).

---

[5] In  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit cases submitted or decided prior to October 1, 1981.

Factors which may be weighed in a scale of values, when mentally assessing such ephemeral qualities as "fairness, reasonableness, and adequacy," include the following:

(1)    the strength of plaintiffs' case;

(2)    the reasonableness of the settlement in light of the attendant risks of litigation, and, the best possible recovery;

(3)    the judgment of experienced counsel for the parties;

(4)    whether there is evidence of collusion;

(5)    the extent of discovery and the stage of the proceeding;

(6)    the expected length, complexity, and expense of further litigation; and

(7)    objections to the settlement.

*See, e.g., Manual for Complex Litigation Third* § 30.42, at 238; *Cotton*, 559 F.2d at 1330-31.   Other courts have listed essentially the same factors in slightly different terms, describing them as follows:

(1) The complexity, expense, and likely duration of the litigation ...; (2) The reaction of the class to the settlement ...; (3) The stage of the proceedings and the amount of discovery completed ...; (4) The risk of establishing liability ...; (5) The risk of establishing damages ...; (6) The risk of maintaining the class action through the trial ...; (7) The ability of the defendants to withstand a greater judgment; (8) The range of reasonableness of the settlement fund in light of the best possible recovery ...; (9) The range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation ....

*City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir. 1974), abrogated on other grounds by *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000); *see also Leverso*, 18 F.3d at 1530-31.  All factors need not be met; courts are to weigh the totality of these factors in light of the particular circumstances.  *D'Amato v. Deutsche Bank*, 236 F.3d 78, 86 (2d Cir. 2001) (settlement approved despite fact that defendant's ability to withstand a greater judgment weighed against settlement, since other *City of Detroit* factors weighed heavily in favor of settlement).   Moreover, a legion of authority holds that trial judges are not expected to "convert settlement hearings into trials on the merits" or "mini-trials":

> While proponents of a class settlement bear the burden of proving that the proposal should be approved, ... they should not be required to stage a mini-trial on the merits, the event which settlement aims to preclude.

*Ohio Public Interest Campaign v. Fisher Foods, Inc.*, 546 F. Supp. 1, 6 (N.D. Ohio 1982) (*citing In re Armored Car Antitrust Litig.*, 472 F. Supp. 1357, 1367 (N.D. Ga. 1979), *aff'd in part, rev'd in part on other grounds*, 645 F.2d 488 (5th Cir. 1981)); *see also City of Detroit*, *supra*; *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195 (5th Cir. 1981); *United States v. Allegheny-Ludlum Indus., Inc.*, 517 F.2d 826 (5th Cir. 1975), *cert. denied*, 425 U.S. 944 (1976); *Cotton*, *supra*; *Flinn v. FMC Corp.*, 528 F.2d 1169 (4th Cir. 1975), *cert. denied*, 424 U.S. 967 (1976); *Bullock v. Estate of Kircher*, 84

F.R.D. 1 (D.N.J. 1979); *American Basketball Ass'n Players Ass'n v. Nat'l Basketball Ass'n*, 72 F.R.D. 594 (S.D.N.Y. 1976).

Indeed, the very purpose of a settlement is to avoid the need to determine sharply contested issues and dispense with expensive litigation and discovery:

> The compromise of complex litigation **is favored both by strong judicial policy and public policy**.  Due to their uncertainty, difficulty of proof, and length, and in the interest of judicial economy, class action [lawsuits] should be settled whenever possible, as soon as possible.

*In re Corrugated Container Antitrust Litig.*, 556 F. Supp. 1117, 1157 (S.D. Tex. 1982), *aff'd*, 687 F.2d 52 (5th Cir. 1982) (emphasis added) (*citing In re Corrugated Container Antitrust Litig.*, 659 F.2d 1322, 1325 (5th Cir. 1981), *cert. denied*, 456 U.S. 998 (1982)); *Pfizer, Inc. v. Lord*, 456 F.2d 532 (8th Cir. 1972), *cert. denied*, 406 U.S. 976 (1972)); *see also* Fed. R. Civ. P. 1(c) ("These rules shall be construed to secure the just, speedy, and inexpensive determination of every action.").  Other courts have explained the limited scope of the judicial approval inquiry as follows:

> The very uncertainty of outcome in litigation, as well as the avoidance of wasteful litigation and expense, lay behind the congressional infusion of a power to compromise.  This is a recognition of the policy of the law generally to encourage settlements.  This could hardly be achieved if the test on hearing for approval meant establishing success or failure to a certainty.

*In re Corrugated Container Antitrust Litig.*, 643 F.2d at 212.

> Voluntary out of court settlement of disputes is highly favored in the law ....  The court will not, therefore, substitute its own judgment for the good faith negotiations of experienced counsel ....  The Court should not turn the settlement hearing into a trial on the merits ....  Thus, the trial court has a limited scope of review for determining fairness.  The very purpose of settlement is to avoid trial of sharply disputed issues and the cost of protracted litigation ....  The Court may limit its fairness proceeding to whatever is necessary to aid it in reaching a just and informed decision ....  ***An evidentiary hearing is not required.***

*In re Agent Orange Prod. Liab. Litig.*, 597 F. Supp. 740, 758-760 (E.D.N.Y. 1985) (emphasis added), *aff'd.,* 818 F.2d 145 (2d Cir. 1987); a*ccord Bowling v. Pfizer, Inc.*, 143 F.R.D. 141 (S.D. Ohio 1992); *Cotton v. Hinton v., supra*.

The courts have repeatedly emphasized that the fairness of the class settlement is the dispositive inquiry:

> A settlement hearing is not a substitute for a trial, and the Court's function does not encompass determining the controversy on the merits.  United States v. Allegheny-Ludlum Industries, 517 F.2d 826, 845 (5th Cir. 1975).  Rather, the court must be satisfied that the parties acted prudently in achieving the specific advantages gained through compromising the litigation and in eliminating the risks attendant upon the trial on the merits ....  The court must evaluate the terms of the settlement to determine their fairness, wisdom, reasonableness and adequacy ...

*American Basketball Ass'n Players Ass'n*, 72 F.R.D. at 598.

And in evaluating the fairness of the settlement, the inquiry is a narrow one:

> While the Court is called upon to exercise an independent judgment in evaluating the settlement terms, the settlement hearing should not be transformed into an abbreviated trial.  The court must guard against substituting its judgment for that of the

parties who presumably arrived at a good faith compromise after arms length bargaining.

*Voege v. Ackerman*, 67 F.R.D. 432, 435-36 (S.D.N.Y. 1975).

Quite properly, then, the courts have refused to transform the settlement process into a trial over what relief might have been gained but for the settlement:

> Neither should it be forgotten that compromise is the essence of a settlement.  The trial court should not make a proponent of a Proposed Settlement justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes.

*Cotton*, 559 F.2d at 1331; a*ccord Bowling*, 143 F.R.D. at 154; *Bennett*, 737 F.2d at 986; *Luevano v. Campbell*, 93 F.R.D. 68, 87 (D.D.C. 1981) ("Where plaintiffs are confronted with all of the uncertainties of litigation, it is proper for class counsel and the class representatives to compromise in their demands for relief in order to obtain <u>substantial assured relief</u> for the class.").

 In determining whether to approve a class action settlement, the district court must determine whether it is "fair, adequate, and reasonable, and not a product of collusion."  *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000); *Malchman v. Davis*, 706 F.2d 426, 434, 436 (2d Cir. 1983) ("[T]o survive appellate review, the district court must show it has explored comprehensively all relevant factors").  In so doing, the Court must "eschew any rubber stamp

approval" yet simultaneously "stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *City of Detroit*, 495 F.2d at 462. Judicial discretion should be exercised in light of the general policy favoring settlement. *See Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982). A strong presumption of fairness attaches to proposed settlements that have been negotiated at arm's-length. *See Chatelain v. Prudential-Bache Sec.*, 805 F. Supp. 209, 212 (S.D.N.Y. 1992).

Based on the following review of all applicable factors, the Court finds that the Proposed Settlement is fair, adequate and reasonable, free of collusion, and due to be approved. In reaching its findings and conclusions, the Court does not rule, and does not intend to imply how it would rule, on the merits of the claims at issue for purposes of continued litigation. Instead, the Court herein simply ***assesses the basis for compromise and the reasonableness of the compromise*** reached under the totality of the circumstances presented by this record.

**C.     The Complexity, Expense and Likely Duration of the Litigation**

Little needs to be said about the complexity and expense that both sides would incur were the case to be fully litigated.  The case involves insurance policies that extend back nearly 80 years and encompasses hundreds of thousands of Class Members, alleging discriminatory pricing of policies dating back to 1930.  Litigating these civil rights claims would require extensive and expensive proof of the actuarial and underwriting procedures for a vast time period, which would entail substantial expert testimony concerning complex actuarial methodologies.  Moreover, the litigation would involve proving the then-existing regulatory schemes pursuant to which the alleged race-distinct pricing was established, approved and, in some cases, mandated, along with pertinent policy pricing assumptions, product development and other relevant determinations.   The evaluation and development of these complex factual issues over this vast time period would require substantial expert testimony; review of hundreds of thousands of historical policy, pricing, and mortality documents by the parties, witnesses, this Court, and the appellate courts; comprehensive review and interpretation of decades of state regulation; review of thousands of individual variables that determine the overall effect of any particular pricing practice or policy design on any given individual, including his or her personal history, policy history, premium history, and benefit history; and all the attendant costs and delays of

such litigation just to determine liability, much less to determine the appropriate relief to which each Class Member might be entitled.

Allowing this case to continue to trial would lead to a prolonged, expensive, and complex litigation, which would be highly unfavorable to many of the elderly Class Members, who may not survive the elapsed time it may take before all appeals are exhausted.  This factor strongly militates in favor of settlement.  *See, e.g., In re Metropolitan Life Derivative Litig.*, 935 F. Supp. 286, 294 (S.D.N.Y. 1996) (finding that "settlement would undoubtedly be in the best interest of all the parties" in light of the "effort and expense that would be required to take [the] case to and through trial"); *TBK Partners, Ltr, v. Western Union Corp.*, 517 F. Supp. 380, 389 (S.D.N.Y. 1981), *aff'd.,* 675 F.2d 456 (2d. Cir. 1982) (approving settlement where "further prosecution of [the] action … would entail for class members severe problems of proof dependent upon ancient documents and historical accounts covering at least 99 years of history, thereby raising serious questions as to authenticity, completeness, and admissibility").

Before any trial could have been held in this action, the Court would have had to consider numerous summary judgment motions on multiple grounds.  (*See, e.g.,* Appendices C-K to Liberty National's Statement of Facts, Evidence, and Authorities in Support of Proposed Class Action Settlement.

Even if those motions were denied, the trials of liability and damages that were scheduled in this case undoubtedly would have lasted for many weeks or months and would have required significant time and expense in presenting experts, legal memoranda, dispositive motions, witnesses, documentary evidence, and legal arguments, and perhaps endless individual hearings to determine individual entitlement to monetary relief, equitable or otherwise. Any liability judgment in favor of the Class would almost certainly have resulted in an appeal, which could prolong the case for years, and the same would be true at the conclusion of any trial on Class-wide relief.  *Cf. Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002) ("Summary judgment motions were possible, extensive trial preparation was inevitable, and post-judgment appeals were highly likely.  All of the foregoing would have extended the case and delayed the ability of the class to recover for years.").   Such complex and prolonged litigation is particularly undesirable where, as here, many of the surviving Class Members are already elderly.   Numerous Class Members, including one of the original Named Plaintiffs (Fannie McConnell), have already died during the pendency of this case.  (*See* M. Docs. 155, 156 and 159).

Liberty National had notified the Court that it was prepared to file a new Petition for Certiorari, and a Motion to Stay the Trial pending the petition, when the Settlement in principle was reached.  (*See, e.g.,* M. Doc. 158).  Even

if that petition and motion to stay had been unsuccessful, the delays inherent in continued litigation of these claims would not have been in the best interests of the increasingly elderly Class.  In order to potentially prevail, the Class was faced with first overcoming Liberty National's impending summary judgment motions; followed by a lengthy trial of liability; followed perhaps by another appeal and certainly by further lengthy proceedings to determine Class-wide relief; followed by another possible appeal or by individual trials on the claims of the consolidated Plaintiffs; followed by an appeal as of right on both Class and merits issues, all with an uncertain outcome, and with a likelihood of further petitions for certiorari by whichever party was dissatisfied with the result on appeal.  Each appeal would carry with it the possibility of remand and rehearing or retrial, creating the potential for even further unavoidable delay and expense.  Given the substantial defenses to liability and Class certification Liberty National has pressed throughout this litigation, and would have continued to press on appeal, it is evident that even the most expeditious attempt to adjudicate these claims on a contested basis would be extremely lengthy, extremely expensive, extremely complex, and extremely unpredictable in result.  Continued litigation is not an attractive option for anyone involved in this case.

**D.      Reaction of Class Members.**

The reaction of the Class to the Settlement is clearly not antagonistic. Despite an extensive notice program which included mailing of printed notices describing the Proposed Settlement, extensive publication of advertisements and summary notices regarding the Settlement in a large number of newspapers, posting of the mailed Notice and other Settlement documents on Liberty National's website, posting of Summary Notice Cards in Liberty National's field offices, direct notice by certified mail to attorneys representing Class Members who were named plaintiffs in the consolidated actions, and extensive radio notice, no Class Member objected to the Proposed Settlement.  (*See generally Moore* Doc. 226 at Exs. A-D; M. Doc 174).

Other courts have approved class action settlements even in the face of a substantial percentage of objections.  *See, e.g., Huguley v. Gen. Motors Corp.*, 999 F.2d 142, 145 (6th Cir. 1993) (settlement in no opt-out class action properly approved over objections of *15% of the class*, and separate actions by class members in other courts were properly enjoined); *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1325 (2d Cir. 1990) (settlement approved over objections of a *majority of class members*); *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 890 (7th Cir. 1985), *cert. denied*, 478 U.S. 1004 (1986) (settlement approved with *15%* objecting); *Reed v. Gen. Motors*

*Corp.*, 703 F.2d 170, 174 (5th Cir. 1977) (settlement approved with 600 of 1469 class members objecting (*40%*), as well as 23 of 29 named plaintiffs); *Cotton*, 559 F.2d at 1331 (settlement approved with *50%* objecting); *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799 (3d Cir. 1974), *cert. denied*, 419 U.S. 900 (1976) (settlement approved with 82 of 452 (*20%*) objecting).  Given such authoritative guidance and the absence of any Class Member objections to this Settlement, this factor clearly favors final approval of the Settlement.


**E.     State of Proceedings and Amount of Discovery Completed.**

With respect to the third factor, the Court notes that the Proposed Settlement was reached after over six years of hard fought litigation, in which tens of  thousands of pages of documents were produced, numerous depositions were taken, and a motion for class certification was contested, considered and ruled upon.  This litigation has reached a very advanced stage, resulting in sufficient discovery by Plaintiffs to assure the ability to "weigh[] their position based on a full consideration of possibilities facing them," *Klein ex rel. Ira v. PDG Remediation, Inc.,* No. 95 CIV. 4954(DAB), 1999 WL 38179, at *2-3 (S.D.N.Y. Jan 28, 1999) (quoting *In re Salomon Inc. Sec. Litig.*, No. 91 Civ. 5442 (RPP), 1994 WL 265917, at *13 (S.D.N.Y. June 16,

1994)); *see also In re American Bank Note Halographics*, 127 F. Supp. 2d 419, 425 (S.D.N.Y. 2001).   This extensive discovery provides Plaintiff's counsel with a fully-informed basis to negotiate a reasonable compromise and assess the fairness of the Proposed Settlement.   *See Maley*, 186 F. Supp. at 363-64.  This factor too weighs heavily in favor of approving the Settlement.

"There is no precise yardstick to measure the amount of litigation that the parties should conduct before settling." *In re Rio Hair Naturalizer Prods. Liab. Litig.,* No. MDL 1055, 1996 WL 780512, at *13 (E.D. Mich. Dec. 20, 1996).   Even settlements reached at a very early stage and prior to formal discovery may be approved where the settlement represents substantial concessions by both sides and there is no evidence of collusion. *D'Amato*, 236 F.3d at 87; *Weiss v. Mercedes-Benz of N. Am., Inc.*, 899 F. Supp. 1297, 1301 (D.N.J. 1995), *aff'd.,* 66 F.3d 314 (3d Cir. 1995); *see also Manners v. American Gen. Life Ins. Co.*, No. Civ.A. 3-98-0266, 1999 WL 33581944, at *22 (M.D. Tenn. Aug. 11, 1999) (because the settlement was the product of extensive, contentious, arms-length negotiations lasting for close to a year such history "clearly counsels in favor of approving the settlement").

The fiercely contested history of this case, the lengthy discovery and voluminous evidentiary submissions that preceded this Court's contested class certification order, the fact that merits discovery had been completed

thereafter, and the abundant evidence submitted in support of this settlement demonstrates that the formal and informal discovery conducted, together with the other information available to Class Counsel and their experts, provided a more than adequate predicate for the Proposed Settlement.

**F.    The Risk of Establishing Liability.**

With respect to the likelihood of establishing defendant's liability, there is obvious risk that Plaintiffs might not prevail if this case were litigated through trial and the exhaustion of all appeals.  To prove their case, Plaintiffs would have had to show by a preponderance of evidence that Liberty National intentionally charged African-Americans more (or provided them lower benefits) than similarly situated Caucasians for insurance sold during the decades-long class period.  Liberty National has also contended that Plaintiffs would have had to prove by a preponderance of the evidence (i) that Plaintiffs' claims were brought within the period of the statute of limitations; (ii) that Liberty National used flawed mortality tables or illegally relied on accurate ones; and (iii) that Liberty National's alleged nondiscriminatory reasons for any distinctions, such as state regulatory mandates and differing mortality risks, differing lapse rates and expenses for the two groups, were

legally invalid or factually pretextual.  Liberty National further contends that Plaintiffs would have also had to demonstrate that each Class Member had standing to recover.  *See Domino's Pizza, Inc.. v. McDonald*, — U.S. —, 126 S. Ct. 1246 (Feb. 22, 2006).  Further, in addition to overcoming timeliness defenses, Plaintiffs would have had to successfully argue that 42 U.S.C. §§ 1981 and 1982 should apply retroactively to private conduct that occurred in the first half of the 20th century, well before the Supreme Court reversed long-standing precedent and pronounced that these statutes applied to private conduct.  *See Runyon v. McCrary*, 427 U.S. 160 (1976); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968); *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265-66 (1994).  The Court makes no finding or implication on how it would rule on this issue if it were necessary to do so, but it is clear this issue provides ample reason for compromise of these claims.

Indeed, Liberty National has argued that binding precedent from the former Fifth Circuit establishes that it would be fundamentally unfair to impose liability under § 1981 for private employment discrimination that occurred before July 2, 1965, the effective date of Title VII, because no one had notice that such discrimination was illegal until that date.  *See Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 255-56 (5th Cir. 1974) (citing *Brown v. Gaston County Dyeing Mach. Co.*, 457 F.2d 1377, 1385 (4th Cir.

1972) (Dupree, J., concurring in part and dissenting in part)); *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364, 1375, 1378-79 (5th Cir. 1974). Liberty National likewise argues that restitutionary or other monetary relief could be awarded where, as here, the alleged discrimination at issue may have been compelled, approved, or permitted by state law. *LeBlanc v. Southern Bell Tel. & Tel. Co.*, 333 F. Supp. 602, 610-11 (E.D. La. 1971), *aff'd*, 460 F.2d 1228 (5th Cir. 1972). Liberty National also points out that the United States Supreme Court has in some circumstances denied retroactive relief under federal civil rights acts that would upset reserves and actuarial frameworks that were locked in place long ago. *See Florida v. Long*, 487 U.S. 223, 235-36 (1988); *Arizona Governing Comm. v. Norris*, 463 U.S. 1073, 1105-06 (1983) (Powell, J. concurring in part and dissenting in part); *City of Los Angeles Dept. of Water and Power v. Manhart*, 435 U.S. 702, 720-21 (1978).

Plaintiffs would also have had to refute Liberty National's other affirmative defenses, including the asserted applicability of the McCarran-Ferguson Act, the Filed Rate Doctrine, the borrowed Alabama law of survival as to deceased policyholders, the borrowed state statutes of limitations, and the res judicata and release effect of prior class action litigation involving all of Liberty National's merchandise burial policyholders.

The fact that many Class Members have died, and many of the ancient documents that the remaining Plaintiffs would have had to rely on are not now familiar to the available witnesses and may be subject to various interpretations, creates further risk Plaintiffs would not prevail on liability for discrimination. It is also undeniable that this litigation would entail testimony by experts in regard to complex subject matters, which always adds an element of uncertainty as to the outcome. *See In re Sterling Foster & Co., Inc., Sec. Litig.*, 238 F. Supp. 2d 480, 484-85 (E.D.N.Y. 2002). The factual difficulties and legal obstacles that would be raised by Liberty National if this case proceeded to trial pose significant risks to Plaintiffs' ability to demonstrate liability, and further tips the scale towards approval of the Proposed Settlement.

Liberty National further contends that there is considerable doubt whether the insurance practices at issue are even actionable under §§ 1981 and 1982. If they were, the Company argues there would have been no reason for Congress between 1979 and 1985 to repeatedly consider a civil rights bill that would have specifically outlawed reliance on race-distinct mortality to price insurance. *See, e.g.*, H.R. 100 § 4(a), 96th Cong. (1979). The novelty of the

claims asserted further highlights the risk of establishing liability on a fully-litigated basis.[6]

Furthermore, in *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989), the Supreme Court held that § 1981 created no liability for post-formation conduct until it was amended in 1991, and subsequent Supreme Court cases have made it clear that the 1991 amendments cannot be applied retroactively.  Since each policy included in this class was purchased prior to 1991, there is thus an issue as to whether *Patterson* provides a complete or partial defense to all of the § 1981 claims.  *Accord Rivers v. Roadway Express, Inc.*, 511 U.S. 298 (1994).

Liberty National also disputes whether any members of the Class who purchased policies from Service, a former subsidiary of Liberty National, could establish liability.  The evidence is uncontroverted that Service sold its policies to all of its customers at unitary rates and benefits.  Only by comparing the policies and rates of Service to those of its parent Liberty National during the Class period do Class Members have any chance of

---

[6] Liberty National contends that no court has ever held that risk classification based on demonstrated actuarial differences in life expectancy by race is race discrimination prohibited by § 1981 or § 1982.  *See Norris*, 463 U.S. at 1087 n.13; *id.* at 1103-05 (Powell, J., dissenting in part and concurring in part); *Manhart*, 435 U.S. at 724 (Blackmun, J., concurring); *NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992); *Manufacturers Hanover Trust Co. v. U.S.*, 775 F.2d 459, 461 (2d Cir. 1985); *Brown v. Goodyear Tire & Rubber Co.*, 1999 WL 569543 (N.D. Ill. July 28, 1999); *Harary v. Allstate Ins. Co.*, 983 F. Supp. 95, 99 (E.D.N.Y. 1997); *Sims v. Order of United Commercial Travelers*, 343 F. Supp. 112, 114 (D. Mass. 1972).

establishing liability with respect to Service policies.  This exercise is far from certain, despite the fact that Service marketed primarily to African-American households and Liberty National marketed primarily to Caucasian households from 1949-1966.  *Cf. Rush v. McDonald's Corp.*, 966 F.2d 1104, 1119 (7th Cir. 1992) ("[s]ome showing of differential treatment on the basis of race is a necessary element of a claim" under [§ 1981]).

The fact that Service actively marketed its products primarily to African-Americans does not necessarily establish that Service offered African-Americans its policies on terms different than those offered by Service to persons of other races.  Liberty National has presented evidence that Service never charged African-Americans higher premiums than the unitary rates Service charged all of its customers.  (*See, e.g.,* M. Doc 26 at ¶ 18 & Exs. 102-03 (2003 McWhorter Affidavit); *Moore* Docs 229-242 at Exs. 106-10, 145-51and M. Doc. 175 (2006 McWhorter Affidavit); M. Docs. 145, 149 at ¶¶ 44(e), 65 (2005 Affidavit of Randall Mire); *Moore* Docs. 229-242 at Exs. 38-42, 46 and M. Doc. 175 (correspondence relating to Service's separate rate and form filings with Alabama insurance regulators)).  This evidence suggests that Service never offered policies that had different terms or benefits for African-Americans than for any others seeking to purchase from Service..

Even assuming that discriminatory intent could somehow be demonstrated by comparing the actions of one company with those of another (*i.e.,* Liberty National with Service), Liberty National argues that analogous employment discrimination case law would require that the comparator company be similarly situated to the defendant "in all relevant respects." *Smith v. Monsanto Chem. Co.*, 770 F.2d 719, 723 (8th Cir. 1985), *cert. denied,* 475 U.S. 1050 (1986); *see also Molloy v. Blanchard,* 115 F.3d 86, 91 (1st Cir. 1997) (while exact correlation is not necessary, "apples should be compared to apples").[7]

Here the record evidence is uncontroverted that Service had higher lapse rates than Liberty National, and higher expenses.  (M. Doc. 145 ¶ 11 (2005 Mire Report)).   Likewise, the record evidence is uncontroverted that Service marketed predominately to African-Americans, whereas Liberty National marketed predominately to Caucasians.  (M. Doc. 26, at Exs. 38-40 (2003 McWhorter Affidavit)).   It is further undisputed Service's policyholders had higher mortality rates than Liberty National's policyholders, as evidenced by the mortality studies performed by each

---

[7] In the employment discrimination context, a number of courts have concluded that an employee cannot be deemed a similarly situated comparator if she worked in different offices, departments or divisions of the same company — let alone an entirely *different* company — from the plaintiff.  *See, e.g., Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 302-03 (5th Cir. 2000); *Curtis v. Oklahoma City Pub. Sch. Bd. of Educ.*, 147 F.3d 1200, 1217-18 (10th Cir. 1998); *Schrand v. Fed. Pac. Elec. Co.*, 851 F.2d 152, 156 (6th Cir. 1988).

company during the Class period.  (*Id.* at ¶¶ 72-73, 150, 152).  The record is also uncontroverted that Service had lower profits than Liberty National, despite charging higher premiums for allegedly similar products.  (*Id.* ¶ 21 & Exs. 43-47; M. Docs 145, 149 at ¶  105 (2005 Mire Affidavit)).  There is no dispute that the products of the two companies were not identical.  Each offered different benefits such as cash value accumulations, with the cash value accumulations of Service policies often being higher than the most comparable contemporaneous Liberty National policies.   (M. Doc. 145 ¶¶ 38(e), 69).

Liberty National also argues that as  separate companies marketing their policies predominantly to different races through separate agency forces, Service and Liberty National were each obligated throughout most of the Class period to adhere to the State of Alabama's mandated minimum premium rates for merchandise burial insurance, which established higher minimum rates for African-Americans than for Caucasians, and imposed rate and policy form filing and approval requirements applicable to all policies sold in Alabama during the class period.   Liberty National has also presented evidence that the two companies had different products, expense rates, and lapse rates, which would also have to be considered in making any comparison.

Finally, Liberty National argues that §§ 1981 and 1982 protect only direct victims of discrimination   *i.e.*, the contracting parties.   *Dillard v. Baldwin County Comm'rs*, 225 F.3d 1271, 1275 (11th Cir. 2000); *Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851, 854 (8th Cir. 2001); *Spriggs v. Diamond Auto Glass*, 165 F.3d 1015 (4th Cir. 1999); *see also Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166 (1972) (plaintiffs have standing to seek redress for injuries done to them, but may not seek redress for injuries done to others, and one who never sought to become a member had no standing to attack club's membership policies); *Sims v. Order of United Commercial Travelers of Am.*, *supra* (persons who did not apply for insurance policies lacked standing to complain of discriminatory underwriting).   Absent evidence that a given Class Member submitted an application to Liberty National for a policy issued by Liberty National and was rejected by Liberty National on grounds of race, Liberty National contends that no Class Member has standing to complain that he or she was not issued a Liberty National policy on terms more favorable than those offered by Service for its policies. *Cf. Domino's Pizza, Inc.*, 126 S. Ct. at 1252 (only parties to the transaction have standing to sue under § 1981).   According to Liberty National, the fact that Liberty National chose to actively market its policies primarily to Caucasians is arguably insufficient to establish liability under §§ 1981 or

1982 to African-Americans who never even applied for a policy with Liberty National. *Id.*

In sum, Plaintiffs must prevail on numerous hotly contested issues of fact and law in order to establish liability.  Accordingly, there was substantial basis for the compromise agreed to.

**G.    Establishing Damages.**

For many of the same reasons expressed above in connection with establishing liability, Class Members would certainly face numerous difficulties in obtaining any award of equitable or monetary relief.  To prove the pricing or benefit differentials suffered by Class Members as a result of defendant's discrimination, Liberty National has argued that the members would have to demonstrate that each class policy actually purchased adversely differed from the policy that the member would have purchased had there been no discrimination, which in many cases may be an impossible task given that many of the policyholders have since died.  *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 177-78 (S.D.N.Y. 2000), *aff'd.,* 236 F.3d 78 (2d Cir. 2001).  In such cases, plaintiffs would be burdened with trying to prove intentionally discriminatory differentials based largely on

complicated statistical data.  *Cf. Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 198 (S.D.N.Y. 1998).  This factor, as well, weighs in favor of approving the Proposed Settlement.

Each plaintiff may have significant difficulty proving entitlement to and the amount of restitution for other reasons.  Extensive actuarial and other expert testimony would be required to establish what if any policies were comparable policies, and any net price and benefit differentials as to each. Liberty National contends that each Class Member's policy, payment, loan history, benefit history, and claim history would also have to be painstakingly reconstructed.  Extensive actuarial and other expert testimony would certainly be required as to relief issues. The burden, expense, and delay of this process would not clearly yield a result more beneficial in the final analysis than the results of this Settlement.

Class Members would have potentially faced numerous hurdles in establishing any entitlement to punitive damages.  *Kolstad v. American Dental Ass'n*, 527 U.S. 526 (1999).  However, the Settlement allows those Class Members who have individual claims for punitive damages currently pending before this Court in the consolidated actions to proceed with their claim for punitive relief.

**H.    Risks of Maintaining Class Action.**

Although this Court previously granted class certification in this action on a contested basis, both parties acknowledge that decertification of these novel claims remains a threat. *Compare In re Monumental Life Ins. Co.*, 365 F.3d 408 (5th Cir, 2004), *with Thorn v. Jefferson Pilot Life Ins. Co.*, No. 05-1162, 2006 WL 335892 (4th Cir. Mar. 9, 2006); *see also Reeb v. Ohio Dep't of Rehab. & Correction,* 435 F.3d 639, 641 (6th Cir. 2006) (vacating certification of Rule 23(b)(2) class).    Liberty National moved for reconsideration of this Court's prior certification of a class on a contested basis, and unsuccessfully sought discretionary appellate review, but would ultimately have an opportunity to obtain appellate review of that order as of right at some point.   The age and novelty of the claims asserted and individual issues that could well develop in further litigation of this matter could also lead this Court to decertify this action at any time if the litigation proceeded to trial.   Clearly then, there is a risk of the Class being decertified either before, during or after trial but for this Settlement.   *See, e.g., Rutstein v. Avis Rent-a-Car Systems, Inc.*, 211 F.3d 1228 (11th Cir. 2000); *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293 (7th Cir. 1995).   This factor also weighs in favor of the Settlement.

### I.      Ability to Withstand Greater Judgment.

The ability of the defendant to withstand a greater judgment is one factor which the Court should consider, but it is not necessarily dispositive. *See e.g., City of Detroit*, 495 F.2d at 463.  Liberty National is a substantial and viable company.  Obviously, if one were to <u>assume</u> a succession of large individual damage awards to each and every Class Member and affirmance of those awards on appeal, one could conjure a scenario which would not only exhaust the availability of funds from which Class Members could be compensated, but would also eliminate the thousands of jobs Liberty National provides, as well as the insurance coverage Liberty National provides to the holders of its insurance policies (whether in this Class or otherwise). However, as shown above, it is not necessary to reach that conclusion to justify this Settlement, which provides effective benefit enhancements that are reasonably sufficient to fully offset the average premium differentials alleged.

### J.      Range of Reasonableness of Settlement.

The next factor which the Court must consider is the range of reasonableness of the Settlement in light of all the facts and circumstances. The substantial relief provided by this Settlement compares very favorably

with the potential recovery as a result of full litigation of this class action. Under the Settlement, Class Members have the opportunity to receive enhancement of past and future benefits sufficient to fully offset the average premium differential on the policies at issue.  There is grave doubt they could obtain anything more in a fully litigated trial.

Under the Settlement, all eligible Class Members have the opportunity to receive enhancement of past and future benefits on eligible policies at levels roughly equal to the average percentage premium differentials at issue. The Settlement also provides opportunities for reinstatement and enhancement of eligible lapsed policies.  Such is just the result that class actions were designed to offer -- fair and equitable relief for the Class as a whole.

In light of the totality of the circumstances, then, this Court has no trouble concluding that the Settlement compares favorably with any reasonably possible recovery through litigation.  Indeed, the Court concludes that this Settlement provides the best mechanism for affording maximum reasonable relief to the Class as a whole.

### K.    Other Factors.

This litigation was hard-fought by both sides with counsel that have shown themselves to be capable and experienced in class action litigation. The Court finds that the class action Settlement was reached through arm's length negotiations after years of hard-fought litigation, and that it was negotiated in an adversarial manner after substantial factual investigation, extensive legal analysis, expert investigation, a hotly contested class certification, and thorough discovery.   The Court finds no evidence of improper influences in the settlement process, and thus concludes that there is no evidence of collusion in reaching the Proposed Settlement.

The terms and scope of the Release, injunctions and dismissal of claims provided for in the Settlement are appropriate in light of all the facts and circumstances.  *Cf. Nottingham Partners v. Trans-Lux Corp.*, 925 F.2d 29 (1st Cir. 1991); *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367 (1996).  It is entirely appropriate for the Release in this action to confer a complete and final peace as to all matters it purports to cover.

**L.    Summary of Conclusions After Analysis of Approval Factors.**

This Court has reviewed the Proposed Settlement in light of the foregoing standards, and makes the following findings and conclusions with regard to those standards.

- The Settlement is fair, reasonable, adequate, and the relief provided or made available to each Class Member is substantial, and satisfies Plaintiffs' primary litigation objective of fairly redressing the challenged pricing and benefit differentials.

- The amount of such relief and other terms of agreement, when balanced against the attendant risks of litigation, indicate that the settlement is fair and reasonable.

- Experienced and highly qualified Class Counsel fully support the settlement.

- The parties engaged in substantial *formal* discovery, and had more than sufficient information to assess the relative merits of claims and defenses.[8]   This court is satisfied that, after years of substantial *formal* and *informal* discovery, counsel are fully aware of the relative strengths and weaknesses of this case.

- Absent settlement, Liberty National and the Class face considerable risk, uncertainty, and expense in litigation over class certification, liability, and remedial issues.

- There is no evidence indicating settlement is the product of fraud, duress, or collusion.   That conclusion is demonstrated by a number of factors, including:  the length and complexity of the settlement agreement itself, and the trade-offs reflected therein; the context in which the settlement was reached (*i.e.*, following lengthy, formal and informal discovery, contested class certification, and arm's-length negotiations conducted by experienced attorneys who have demonstrated their professionalism in this Court over a number of years).

---

[8]  *Cotton v. Hinton,* 559 F.2d 1326, 1332 (5th Cir. 1977) (holding that discovery, in its most efficient utilization, *should be* totally extra judicial; informality in the acquisition of relevant facts is desirable).

- All applicable requirements of Fed. R. Civ. P. 23 are satisfied.

- Although Liberty National has agreed to pay class counsel "reasonable" attorneys' fees and expenses within certain limits, the specific limits on the amount of fees to be sought was not negotiated by class counsel prior to agreement on the class relief.[9]

- The notice afforded the Class was the best notice practicable under the circumstances, and fully complies with all requirements of Due Process.

- The fact that there are no pending objections, that there are ongoing claims for settlement benefits, and that there has been and no concerted challenge to the settlement, strongly indicate that Class Members as a group view the settlement as fair and adequate.

- The proposed method of distributing settlement funds among Class Members is a fair and reasonable method of approximating relative amounts of equitable relief with due consideration for the risks and uncertainties of litigation and the desirability of compromise.

- The terms and scope of the release, dismissal and injunctions contemplated by the Settlement are fair, appropriate, and consistent with all applicable law, and are due to be approved fully enforced.

**M.    Incentive Awards**

Class Counsel request that the Court grant the representative Plaintiffs a small incentive award of $5,000 for the time and effort they devoted in pursuing this litigation.  Here, such a distribution is patently fair.  The record reflects that each plaintiff had extensive personal involvement in bringing to

---

[9]  *See Manual for Complex Litigation Third* § 30.42, at 239 (1995).

light those facts that culminated in this lawsuit; obligated herself to participate in the litigation process including depositions and consultations with Class Counsel; and, played a substantial role in achieving this result for the Class. Ellen Gayle Moore and Fannie McConnell's willingness to pursue this action on behalf of other African-American policyholders with little financial resources of their own was a necessary means of creating the benefit conferred on the entire Class.   Given these and other efforts in advancing the litigation, it is fair and reasonable to accord the Named Plaintiffs this modest incentive award.

### N.    Attorneys Fees.

At the Fairness Hearing in support of the parties' motion, attorneys' fees were sought and justified.  Plaintiffs have asked for a fee of $3.35 million, including all past and future costs and expenses for themselves and their experts and consultants.   The fee award sought in this case is more than justified.  The claims in this case were brought pursuant to 42 U.S.C. § 1981 and 42 U.S.C. § 1982.  If Plaintiffs had prevailed at trial, 42 U.S.C. § 1988 would have permitted the shifting of Plaintiffs' fees and costs entirely to Liberty National.  Plaintiffs' lodestar to-date is $5,595,222.45 and Plaintiffs have incurred expenses in excess of $400,000.  Yet, Plaintiffs have requested a fee and expense award of only $3,350,000, less than 60% of the actual fees

and expenses incurred in this action to-date.  Obviously, the award is justified under a lodestar analysis.

The Plaintiffs' fee and expense request is also justified under a common fund approach. The Court finds that the total value of this Settlement to the Class is at least $6 million, exclusive of the injunctive relief, the fees and expenses sought and administration costs. In addition, the benefit to the Class includes the $3.35 million negotiated fee to Class Counsel and the hundreds of thousands of dollars in costs incurred by Liberty National thus far to administer the settlement. This brings the total benefit to over $10 million.  To the extent the reserves currently expended by Liberty National under the Settlement will purchase even larger death benefits to be paid in the future, the value of the Settlement is higher still.

Thus, the total of the attorneys' fees and expenses represents at most 33% of the aggregate Settlement benefits.[10]  Plaintiffs incurred $417,685.55 in expenses during the prosecution of this action. Therefore, the actual attorney fees are  $2,932,315 million, representing less than 30% of the benefit bestowed on the Class Members, even without consideration of the injunctive relief. This is a reasonable percentage. *Di Giacomo v. Plains All American Pipeline*, Nos. Civ.A. H-99-4137 & H-99-4212, 2001 WL 34633373, at *7 (S.D. Fla. Dec. 19, 2001); *Gwozdzinnsky   v. Sandler Assoc.*, No. 97-7314,

---

[10]

1998 WL 538064 (2d Cir. Mar. 13, 1998); *In re IKON Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166 (E.D. Pa. 2000); *Kurzweil v. Phillip Morris Co.*, Nos. 94 Civ. 2373(MBM) & 94 Civ. 2546(BMB), 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999); *Fournier v. PFS Investments, Inc.*, 997 F. Supp. 828, 832 (E.D. Mich. 1998).

Class litigation involving race discrimination claims are inherently risky, and Plaintiffs' success was not a foregone conclusion. *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 689 (N.D. Ga. 2001); *see also Roberts v. Texaco, Inc.,* 979 F.Supp. 185, 190 (S.D.N.Y.1997). The Court recognizes that Class counsel undertook this litigation on a purely contingent basis, thereby bearing the risk of non-recovery. *Hobson v. First State Bank*, 801 S.W.2d 807, 812 (Tenn. Ct. App. 1990) (time devoted by class attorneys precluded them from "other extensive outside employment, and that the litigation presented great hazards and risks to them"). In addition, Counsel funded the litigation on behalf of Plaintiffs who could ill-afford to prosecute this case on their own.

The Eleventh Circuit  noted in *Camden I Condominium Ass'n v. Dunkle*, 946 F.2d 768, 774-75 (11th Cir. 1991) that several additional factors are pertinent for setting and evaluating percentage fee awards in common fund cases: (1) whether the settlement confers non-monetary benefits upon the class; (2) whether there are any substantial objections to the settlement terms or the fees request; (3) the economics involved in prosecuting a class action;

(4) the time required to reach settlement; and (5) any additional factors unique to a particular case which may be relevant to the District Court's consideration. *Camden I* 946 F.2d at 775.  In this case, the settlement confers non-monetary benefits on the class in the form of changes to Liberty National's business practices. Second, no objections to the fee award in the settlement agreement were filed. Third, as discussed above, Class Counsel expended resources in prosecuting the class action, both in terms of out-of-pocket costs and hours of attorney time, with no guarantee that the litigation would succeed. Finally, this case was brought to a successful conclusion with consequent benefits to the class and the Court.

On this last point, many Courts consistently recognize that the result achieved for the class is the most important factor to be considered in making a fee and expense award. *See*, *e.g.*, *Hensley*, 461 U.S. at 436 ("the most critical factor is the degree of success obtained"); *Hobson*, 801 S.W.2d at 812 (in approving the recovery of attorney fees out of common fund, court recognizing that "the benefits conferred upon the class as a whole were substantial").

In addition to the other mentioned benefits, Class Members who are elderly and uninsurable today may have their policies re-instated as part of the relief agreed to by Liberty National. Obviously, given these Class Members'

age, these insurance benefits will provide a value beyond their actual face amounts.

The Class has also been provided a substantial benefit via further reparations for alleged past discrimination. As has been noted, eradication of racism in this country "is a worthy goal" squarely within the public interest. *Roberts,* 979 F.Supp. at 197; *Williams v. Vukovich*, 720 F.2d 909, 923 (6th Cir. 1983) (court stating that "the rewards of attaining racial diversity in the workplace" serve the public interest). The Settlement furthers this public interest because it brings to light allegedly unconscionable conduct, puts an end to an allegedly racially discriminatory practice, compensates victims of that alleged discrimination and ensures that Class Members have the opportunity to receive the benefits to which they are and were entitled under their insurance policies.

Fee agreements between plaintiffs and defendants in class actions are encouraged, particularly where, as here, evidence has been presented that the attorneys' fees were negotiated after the terms of the Settlement have been agreed to by the parties. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (negotiated attorneys' fees are the "ideal[]" toward which the parties should strive); *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 568 -70 (7th Cir. 1992) (market factors, best known by the negotiating parties themselves, should determine the quantum of attorneys' fee). In the absence of any evidence of

collusion or detriment to the class, this Court will give substantial weight to a negotiated fee amount, assuming that it represents the parties' "best efforts to understandingly, sympathetically, and professionally arrive at a settlement as to attorney's fees." *Elkins v. Equitable Life Ins. Co.,* No. CivA96-296-Civ-T-17B, 1998 WL 133741 at *34 (M.D. Fla. Jan. 27, 1998) (quoting *Johnson v. Georgia Highway Express Inc.*, 488 F.2d 714, 720 (5th Cir.1974), *overruled on other grounds, Blanchard v. Bergeron,* 489 U.S. 87 (1989)). This weight is particularly appropriate when, as here, no objection has been raised to the fee award and the amount of fees is entirely consistent with a reasonable fee award under the circumstances of the case.

Finally, the Court notes that Class Counsel's efforts on behalf of the Class are not done.  The claim-in deadline for participation in the Settlement is not until July 31, 2006. As Settlement is implemented, Class Members will inevitably have questions and raise issues, and Counsel will be called upon to answer questions concerning claims for many months. Finally, throughout implementation, Class Counsel must verify Liberty National has met its obligations to Class Members. All of the future time and expenses that Class Counsel will incur will not be further uncompensated.

For the foregoing reasons, the attorneys' fees awarded in this case are fair and reasonable.

## CONCLUSION

For all of the foregoing reasons, and upon consideration of all of the other evidence of record, this Court finds that the terms of the proposed Consent Decree are fair, reasonable, and adequate under the circumstances, and that the interests of the Class as a whole are better served if this action is resolved by settlement, rather than pursued by means of either continued class litigation on a contested basis or in separate actions.

An appropriate judgment consistent with this Memorandum Opinion shall be entered contemporaneously herewith.

Done the 31st day of March, 2006.


_____

U.W. Clemon

Chief United States District Judge